# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED HEALTHCARE SERVS., INC | * | |
| Plaintiff | * | |
| v. | * | CIVIL NO. JKB-17-2857 |
| MAYOR AND CITY COUNCIL OF BALITMORE, | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff United Healthcare is a health care corporation with its principle place of business in Minnesota. Plaintiff filed this lawsuit against the Mayor and City Council of Baltimore ("the City") alleging violations of due process and equal protection under 42 U.S.C. § 1983, and violations of the City's procurement laws and regulations in connection with the City's decision not to select Plaintiff's bid for provision of medical administration services. Plaintiff now seeks a Temporary Restraining Order ("TRO"), asking the Court to stop the City from implementing contracts with the entities whose bids it did select. For the reasons set forth in this memorandum, the Court will deny the Plaintiff's motion for a TRO by accompanying order.

### I. *Background*

The City, through its Bureau of Purchasing ("BOP") issued a Request for Proposals for Medical Administration Services for HMO & PPO Plans ("RFP") in early 2017. (Pls. Verified Compl. and Application for Temp. Restraining Order, Prel. Inj., and Perm. Inj. ¶ 8, hereinafter

"Compl. and TRO", ECF No. 6.) This RFP called for bids to provide "medical administration services to City employees, retirees, and their dependents." (*Id.*) The RFP also contained numerous instructions, guidance, and rules for submitting bids. For instance, the RFP stated, under the "METHOD OF AWARD" section, that an

> "[a]ward, if made, will be made to the responsive and responsible Proposer(s) for each plan . . . meeting the specifications, terms and conditions and that receives the highest combined evaluation score for Technical and Price Score, as determined by the Evaluation Committee (Committee) and approved by the Board."

(RFP Part 1, Compl. and TRO Ex. 1, ECF No. 6-1 5.) The RFP also had goals for Minority and Woman owned Business participation among the bidders' subcontractors, set at 11% Minority Business Enterprises ("MBE") and 4% Woman Business Enterprises ("WBE"). (*Id.* 16.) It contained explanations of how the Technical and Price Scoring would be calculated, including what percentage of the Technical Scoring would come from a "Network Access" score. (*See id.* at 6-7.)

In addition to these rules and regulations, there are also Baltimore City Code ("City Code") provisions that apply to contract bids for City projects. *See generally* Baltimore City Code Art. 5. Of particular importance, the City Code contains provisions regarding Minority and Women's Business Enterprises and contract bids. *See id.* §28, Part V. For contracts over $50,000 (such as the Medical Administration Services contracts at issue[1]), an RFP must require bidders "to include in [their] bids a certified business enterprise participation affidavit in which the bidder commits to utilize certified business enterprises in a percentage that equals or exceeds the applicable goals." *Id.* §28-48(b)(1). Furthermore, any bid "that does not include the certified business participation affidavit is non-responsive." *Id.* §28-48(b)(2). This provision does not say *when* the affidavit must be sent or received, only that it must be "include[d]" in the bid for it

---

[1] *See* Compl. and TRO ¶ 19, displaying contract amounts for the selected bidders.

to be considered "responsive." A later section, however, provides that RFPs must require bidders to "make good faith efforts before the . . . submission of proposals to meet the contract goal," presumably referring to the goal set for MBE/WBE participation. *Id.* §28-53.

Plaintiff submitted its bid for the HMO, PPO, and Vision portions of the proposal on April 5, 2017 and was notified on August 1 that the City intended to award those contracts to other bidders. (Compl. and TRO ¶¶ 9, 19.) According to the Plaintiff, there were several problems with the City's selections and selection process. First, at the time of the proposed selection, the selected bidders did not meet the MBE/WBE requirements. Carefirst, who prevailed over United for the PPO contract, was 0.61% shy of the necessary 4% for WBE participation. (Recommendations for Contract Awards/Rejections, Compl. and TRO Ex. 9 2, ECF No. 6-9.) Aetna, who beat United for the HMO contract, was 1.41% shy of the necessary MBE participation. (*Id.* at 3.) NVA, who prevailed over United for the Vision contract, had no MBE participation, but met the WBE participation goal. (*Id.* at 4.) NVA's sole MBE subcontractor was not certified to work with Baltimore City. (*Id.*) The City, after a protest from Plaintiff, allowed each of these bidders ten days to come into compliance with the MBE/WBE requirements, and as of September 18, 2017, all of them apparently did. (*See* Def.'s Opp'n to Pl.'s Mot. Temp. Restraining Order Ex. 3, ECF No. 14-3.) Plaintiff maintains, however, that because these bidders came into compliance *after* their selection, Plaintiff was treated unfairly and was, in fact, the only technically "responsive" bidder under the RFP and City Code.

Plaintiff also alleges impropriety surrounding the computation of the Technical Scoring. In order to determine the Network Access, which was factored into the Technical Scoring, bidders were told to identify which health care providers were within their networks on a "disruption report." (Compl. and TRO at ¶¶ 14-15.) It appears that BOP double counted certain

providers in this disruption report. (Compl. ¶ 15; Compl. Ex. 4, ECF No. 6-4.) As a result, if a bidder had access to that provider they would essentially receive double the points, and a bidder without access to that provider would have that loss counted against them twice. This, Plaintiff claims, taints the computation of the Technical Score, which is a key criteria for selection.

At bottom, Plaintiff believes that it was the only bidder to fully comply with the RFP and the City Code, and was the only "responsive" bidder. As a result, Plaintiff is seeking a preliminary injunction to prevent the City from continuing its implementation of the contracts awarded to the other providers. (Compl. and TRO at ¶ 25.) In the interim, Plaintiff seeks the extraordinary remedy of a TRO to prevent the City from continuing its implementation of those contracts, arguing that to wait until trial and a decision on the merits would render this action pointless.

## II. *Analysis*

The City contends that Plaintiff lacks standing to bring this action because "there is no private right of action for a disappointed bidder" and Plaintiff does not, and cannot, allege taxpayer standing. (Def.'s Opp'n to Mot. for TRO 5-6.) The City has also responded to the merits of Plaintiff's request for a TRO. The Court will first address the question of standing and then proceed to the merits of issuing a TRO.

### a. *Standing*

The City asserts that there is no private right of action available to Plaintiff and that Plaintiff cannot rely on taxpayer standing. While both arguments have some merit, the Court is ultimately not persuaded and finds that Plaintiff has standing to bring these claims.

Generally speaking, a disappointed bidder "lacks standing to question the award of a contract," unless state law creates a property interest for the bidder. *Sowell's Meats and Servs.,*

4

*Inc. v. McSwain*, 788 F.2d 226, 229 (4th Cir. 1986). In *Sowells*, the Fourth Circuit upheld the District Court's finding that South Carolina did not "confer a property interest on unsuccessful bidders for public contracts." The City asserts that "long-standing Maryland law" forecloses the possibility of a property interest for disappointed bidders as well, but does not point the Court in the direction of a case establishing this principle. The City cites to a case from the 19th century which in fact suggests that, in addition to taxpayer standing, "proper parties may resort to equity, against municipal corporations and their officers when these are acting *ultra vires*, and when such illegal acts affect injuriously the property owner" something the Plaintiff would likely claim is the case here. *Kelly v. City of Baltimore*, 53 Md. 134, 141 (1880). The only other case which the City puts forth as standing for the proposition that a plaintiff like United "does not have any standing in equity" says no such thing. *See Hanna v. Bd. of Educ. Of Wicomico Cty.*, 87 A.2d 846 (1952). In that case the Maryland Court of Appeals stated:

> On a suit by a taxpayer, a court of equity will not review the exercise of discretion of an administrative agency, if it acts within the scope of its authority, unless its power is fraudulently or corruptly exercised; *but the court will restrain an agency from entering into or performing a void or ultra vires contract or from acting fraudulently or so arbitrarily as to constitute a breach of trust*.

*Id.* at 847 (emphasis added). The City has not convinced the Court that Plaintiff has no property interest. Furthermore, while the Plaintiff does not use the precise words, it would seem that the gravamen of Plaintiff's complaint is that the City *is* acting *ultra vires*, i.e. beyond what it may legally do, in awarding these contracts to nonresponsive bidders.

Plaintiff failed to allege taxpayer standing, and appeared to discount that possibility in the hearing on the propriety of this TRO, but Plaintiff did explicitly state that it may be a taxpayer and would have standing on those grounds. As noted above, the Court believes that, at least on

5

the facts as presented so far, Plaintiff has standing regardless of its status as a taxpayer, but it is worth briefly noting that taxpayer standing may also be available.

The City argued at the hearing that even if Plaintiff was a taxpayer it could not avail itself of taxpayer standing because there must be some "nexus" between the challenged act and the harm suffered. *See Anne Arundel Cty. v. Hardwood Civic Ass'n, Inc.*, 113 A.3d 672, 683 (2015). It would appear that establishing such a "nexus" is a low hurdle for the Plaintiff. The Maryland Court of Appeals has noted that a plaintiff standing on their status as a taxpayer must show "both a governmental action that is illegal or *ultra vires* and that the action may affect injuriously the taxpayer's property (*meaning that it reasonably may result in a pecuniary loss* to the taxpayer or an increase in taxes)." *Id.* (quoting *Anne Arundel Cty. v. Bell*, 113 A.3d 639, 662 (2015). The alleged *ultra vires* action here resulted in a potentially enormous pecuniary loss to the Plaintiff, as Plaintiff is no longer in the running for a significant contract. This is not a particularly attenuated connection between the alleged *ultra vires* action by the City and the alleged harm. Satisfied that Plaintiff has standing to bring this action, the Court will address the merits of granting the extraordinary remedy of a TRO.

b. *Temporary Restraining Order*

For the Court to grant the Plaintiff's requested TRO, Plaintiff must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). This is an "extraordinary and drastic remedy," and "[a]ll four requirements must be satisfied." *Sojourner-Douglass College v. Middle States Ass'n of Colleges and Schools*, Civ. No. ELH-15-01926, 2015 WL 5091994 *31 (D. Md. 2015). In fact, the Plaintiff must make a "clear showing

that [it] is entitled to such relief." *Winter*, 555 U.S. at 22. Plaintiff has failed to make such a clear showing here.

On the first prong, likelihood of success on the merits, Plaintiff cannot overcome the fact that the City, and the Board of Estimates especially, has very broad discretion in determining how best to conduct its business. *See City of Baltimore v. American Federation of State, County and Municipal Employees*, 379 A.2d 1031, 1034 (1977). This is important because Plaintiff's Federal Constitutional claims are weak,[2] and the remaining claim is premised on administrative law, specifically that the City violated the *Accardi* doctrine, which provides that an agency must follow its own rules. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *Pollock v. Patuxent Inst. Bd. of Review*, 823 A.2d 626 (2003) (adopting the *Accardi* doctrine for Maryland state agencies). Plaintiff alleges that the City did not follow its own rules in violation of the *Accardi* doctrine, but Plaintiff cannot point to any rules that the City has clearly broken, given the discretion that the City has in making procurement decisions.

While Plaintiff can surely point to language in the RFP providing guidelines or instructions that it appears the City did not follow, the City is generally given a wide berth in making its decisions. *See George A. Fuller Co. v. Elderkin*, 154 A. 548, 552 (1931) (stating that, absent fraud, collusion, or arbitrary conduct, the decisions of the "board of awards," then a Baltimore City procurement agency, "are not reviewable by the courts.") Plaintiff can point to no provision in the City Code that the City clearly violated in this process. The other bidders that were selected were not in compliance with MBE/WBE requirements when they were selected, but the Code only requires that these bidders make a "good faith effort" to be in

---

[2] Plaintiff points to no racial or gender discrimination in this process and mounts an Equal Protection challenge under a theory of economic discrimination, something that the Plaintiff admitted at the hearing. These alleged discriminatory acts, then, would be reviewed under the "rational basis" standard, and are not likely to succeed.

7

compliance when they submit their bids, and in fact, the City Code only requires that the *RFP require* bidders to make such a good faith effort. Under the City Code bidders must submit a business participation affidavit with their proposal, and it would make sense that such an affidavit must be submitted prior to selection, but the City Code does not clearly demand it. A bid submitted without such an affidavit would be deemed non-responsive, but perhaps once an affidavit has been provided the bid would be considered responsive. While the specific details of the City Code are not entirely clear to the Court, what is clear is that the City has more expertise interpreting the City Code, and its own rules, than the Court. *See Dep't of Economic and Employment Development v. Lilley*, 666 A.2d 921 (Md. 1995) (Hollander, J.) ("The agency's particular expertise in this particular field is entitled to deference." (quotations and alterations omitted)). For example, the City appears to have erroneously double counted providers when computing Network Access, but perhaps the City cared more about these providers, or accounted for that mistake elsewhere in computing the Technical Scoring. And, in any event, the RFP stated that the award will be made to the bidder with the highest Technical and Price Score "*as determined by the Evaluation Committee*," suggesting a fair amount of discretion in making this calculation. (RFP Part 1, p. 5 (emphasis added).) Simply put, the Plaintiff cannot, at this stage, point to any provision of the City Code, any regulation issued by BOP, or any language in the RFP that the City so clearly violated as to be beyond the discretion that the City has in selecting a bid. *See* (RFP Part 2, p. 5 ("The Board of Estimates reserves the right to . . . [r]eject any or all Offers and/or waive technical defects if, in its judgment, the interest of the City shall so require.").)

It is worth noting briefly that even if the Plaintiff could point to a provision of the City Code or language in the RFP that the City clearly violated, that would not necessarily be a

8

violation of *Accardi*. The Court of Appeals of Maryland made clear that when it imported the *Accardi* doctrine to Maryland state law, many of the exceptions came with it. *See Pollock*, 823 A.2d at 637-49 (discussing the *Accardi* doctrine). For example, "it is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it." *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532 (1970). Perhaps the "requirement" that bidders demonstrate compliance with MBE/WBE goals *before* selection is such a "procedural rule,"[3] and compliance with that rule, or lack thereof, would not implicate *Accardi*.

Another exception to *Accardi* is that an agency's failure to follow its own rules is immaterial unless that failure prejudices the Plaintiff in some way. *See Pollock*, 823 A.2d at 645-49 (discussing *Accardi* and prejudice). In *Jay Dee/Mole Joint Venture v. City of Baltimore*, 725 F. Supp. 2d 513 (D. Md. 2010), this Court rejected a similar *Accardi* challenge to the case at bar. In that case, a party's contract was terminated because it was out of compliance with the MBE/WBE requirements, and the party/contractor claimed that the City did not follow provisions of the City Code, for example, by failing to provide the contractor with sufficient notice of its decision. 725 F. Supp. at 529. The Court determined the contractor had failed to demonstrate prejudice because even if the City did not follow the exact letter of the City Code, it still provided the essential information to the contractor. *Id.* at 530. The Plaintiff here cannot clearly demonstrate that it was prejudiced by any one specific deviation from the letter of a law or regulation because, again, the BOE has discretion in making these decisions. That is, even if Carefirst was 0.61% shy of the WBE requirement, or Aetna 1.41% shy of the MBE requirement,

---

[3] The substance would seem to be ensuring that contractors for the City hire a certain percentage of minority and women owned sub-contractors, something that the accepted bidders here apparently have done.

can Plaintiff confidently assert that in the alternative universe where their competition *was* in compliance, and possibly had a higher bid as a result, Plaintiff would have been selected? Likely not.

To be clear, the Court is not declaring ultimate victory for the City, and that is not the job of the Court at this early stage. Plaintiff raises serious issues. But Plaintiff has a significantly higher burden than simply raising issues when asking this Court for a TRO. Plaintiff must make a "clear showing" that it is *likely* to succeed, and it has failed to demonstrate a likelihood of success on the merits given the facts and argument before Court. That is the modest declaration the Court makes today.

The Plaintiff's inability to convince the Court of its likelihood of success, let alone make a "clear showing," is enough to founder its chances of attaining a TRO. Still the Court will briefly discuss the other *Winter* factors. As for the balance of the equities, the Court is going to do harm whether it grants the TRO or not; *i.e.*, either way a party will suffer injury here. It is the Court's job to weigh those harms. And after some consideration it appears that, contrary to Plaintiff's assertion, the potential harms to the Plaintiff do not clearly outweigh those of the City; in fact the harms analysis appears to tip greatly *in favor* of the City. Issuance of a TRO here would stop in its tracks an elaborate and important process, namely the City's reworking of its entire employee health care apparatus. As the City stated in the hearing, notices have been sent to thousands of city employees explaining benefits based on the understanding that the currently selected bidders will remain in their contracts. Nullifying (or even merely staying) the contracts currently being implemented and requiring the City to undergo another round of bidding, or at least wait until the merits of Plaintiff's injunction are determined, would result in either a

suspension of service or, at best a rushed process to solicit new bids, and either result would cause significant harm.

Plaintiff further contends that its harm can in no way be remedied at law as its damages are impossible to calculate. The Court is skeptical of this claim for at least two reasons. First, Plaintiff has provided the Court with estimates for how much the awarded contracts are worth to its competitors. (Compl. and TRO ¶ 19.) If Plaintiff succeeds on the merits, why would they not be able to simply present those figures, minus whatever costs would have been expended in implementing the contract, and ask for a check? Second, even if those figures are themselves too speculative, as Plaintiff argued in the hearing, why could Plaintiff not rely *on its own bid*? That is, if Plaintiff's claim is essentially that, because of impropriety by the City, its bid was not selected when it should have been, why cannot it not be properly remedied by simply seeking damages in the amount it would been paid under that bid (again, minus costs)?

Last, public interest is a close question in this case, but still weighs slightly in favor of the City. To be sure, the public has an interest in transparency in the process by which the City conducts its business, and it has an interest in the City conducting that business in a fair manner. But the public also has an interest in effective and efficient public administration, and has entrusted the City to do its business in the way the City believes is the most beneficial and economical. Therefore a TRO would not be in the public's interest.

### III.  *Conclusion*

The Plaintiff has failed to establish that it is likely to succeed on the merits in this case, that the balance of equities tip in its favor, that it will suffer irreparable harm, *or* that a TRO is in the public interest. To gain a TRO, it must carry its burden as to *all* of these criteria, *see Winter*,

555 U.S. at 20, but it has convinced the Court as to none. Accordingly, Plaintiff's motion for a Temporary Restraining Order will be DENIED by accompanying order.

DATED this 29th day of September, 2017

BY THE COURT:

_____/s/_____
James K. Bredar